542 F.2d 1250
 Rhonda Kay CRAFT, aka Rhonda Kay Pace, a minor, etc., Clyde
D. Pace and Rosanna Craft Pace, Plaintiffs-Appellants,
v.
The UNITED STATES of America et al., Defendants.
UNITED STATES of America, Defendant Third-Party Plaintiff-Appellee,
v.
OTASCO ECONOMY AUTO SALES, INC., et al., Third-Party Defendants.
 No. 75-1090.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 1, 1976.
 
 C. E. Isom, Robert B. Propst, Anniston, Ala., for plaintiffs-appellants.
 Wayman G. Sherrer, U.S. Atty., Henry I. Frohsin, Asst. U.S. Atty., Birmingham, Ala., for defendants.
 James W. Gewin, Birmingham, Ala., for Modern Tool & Die Products.
 Clarence Simmons, Jr., Gadsden, Ala., for Otasco Economy Auto.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before BROWN, Chief Judge, THORNBERRY,* Circuit Judge, and MILLER,** Associate Judge.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 Rhonda Kay Craft (Child)[1] through Rosanna Craft Pace (Mother), and Clyde D. Pace (Father) and Mother, individually, appeal from the grant of summary judgment in favor of the United States (Government).[2] The District Court ruled that Specialist 5 Marvin Roger Minter (Soldier) was not acting within the "line and scope of employment" when he injured Child while operating a ride-type power lawn mower outside his quarters on Fort McClellan, Alabama. We reverse and hold that as a matter of law Soldier was acting within the scope of his employment at the time Child was injured and that no landlord-tenant relationship existed.
 
 
 2
 In November 1971, Soldier was assigned to Company D, 46 Engineer's Battalion, United States Army, Fort McClellan, Alabama, as a repair parts specialist in the motor pool. Pursuant to Army regulations designed to effect the most economical administration of government resources and facilities and to provide for maximum occupancy of housing on military bases,[3] Soldier was given on-post housing in a multi-unit complex where the Pace family also lived. Soldier could have declined the offer, but he would have forfeited a monthly housing allowance[4] which is given to armed forces members when they must reside in non-governmental housing.[5] Because of this practice, Soldier acceded to Government's offer and was assigned to 3719-H Summerall Terrance on Fort McClellan. In front and on one side of the apartment to which Soldier was assigned is a grassy, sloping embankment.
 
 
 3
 Upon beginning residence in this housing, Soldier was briefed by representatives of the Family Housing Office on his responsibilities to care for certain portions of the complex. Among other things, Soldier was required to maintain the grounds immediately surrounding his apartment. Both the manner and method by which the portion of the lawn assigned to Soldier to maintain are specified in detail by Government's regulations.[6]
 
 
 4
 Additionally, every resident was given verbal and written instructions regarding grounds care.[7] The yards were inspected by the Family Housing Office and by the senior ranking resident in each apartment complex.[8] Another indication of the control exercised by Government is shown by Soldier's alarm over the significantly larger yard area which he was required to mow because he occupied a corner apartment. When Soldier asked the Housing Inspector for clarification, he received a restatement of the regulations and was given written orders reaffirming his duty to mow this larger yard area assigned to him. As with all soldiers, failure to follow any order made Soldier subject to military discipline. In this Soldier-lawn mowing affair, Government retained both the right to control Soldier's performance of this mandated duty and exercised its control through regulations, orders, and inspections.
 
 
 5
 Both Soldier and his wife had cut the grass on the embankment portion of lawn designated as their area of responsibility with Government's mowers. However, they had difficulty cutting the hilly portion with this equipment. This experience convinced Soldier and Soldier's wife that a ride-type mower was necessary to mow the grass on the embankment. On April 27, 1972, Soldier purchased a ride-type lawn mower and immediately used it on the lawn.[9] On this date while cutting his assigned portion of the lawn, Soldier struck Child, age eighteen months, severely injuring her. Following this incident, Father and Mother, individually, and Mother on behalf of Child filed actions against Government under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671 et seq.,[10] which takes note of the unique position of military personnel.[11]
 
 
 6
 As indicated by the quotation of the relevant portions of the Tort Claims Act, essential ingredients for successful recovery under this statute include the requirement that Soldier be an employee of Government acting within his "line of duty",[12] the military equivalent of scope of employment. No question was raised in the District Court about Soldier's status as an employee of government and no question exists in light of 28 USCA § 2671's provision that " 'Employee of the government' includes . . . members of the military or naval forces of the United States . . .." Consequently, our attention shifts to a second consideration under the Tort Claims Act.
 
 
 7
 In its ruling, the District Court concluded that Soldier was not acting within the scope of his employment when Child was injured. Because liability on Government is predicated on ". . . circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred",[13] a determination that Soldier was not acting within the scope of his employment bars recovery for Child or her parents under Alabama law which imposes vicarious liability on an employer for an employee's actions under the rubric respondeat superior. Avco v. Richardson, Ala., 1970, 285 Ala. 538, 234 So.2d 556; Perfection Mattress & Spring Co. v. Windham, Ala., 1938, 236 Ala. 239, 182 So. 6, 8; see Solmica of the Gulf Coast v. Braggs, Ala., 1970, 285 Ala. 396, 232 So.2d 638. Alabama decisions hold an employer liable for a negligent act of an employee when the act was
 
 
 8
 "not only 'within the scope of his employment, but also' committed in the accomplishment of objects within the line of his duties, or in or about the business or duties assigned to him by his employer." (Emphasis added). Wells v. Henderson Land & Lumber Co., Ala., 1917, 200 Ala. 262, 76 So. 28, 29.
 
 
 9
 To determine whether Soldier was acting in the line of duty and therefore within the scope of his employment requires an examination of Soldier's actions at the time Child's injury occurred. From the facts set forth above, certain factors are readily apparent. Soldier was a repair parts specialist and had a duty to mow a portion of the lawn surrounding his quarters. Both were duties assigned to Soldier. Soldier's duty to mow his portion of the lawn was specified in written regulations, during oral briefings regarding his responsibility for maintenance of certain aspects of his quarters, through direct questioning by Soldier of a superior, and by a direct order given to Soldier. Failure to comply meant possible imposition of the panoply of sanctions available to Government. Depending on the context of any refusal by Soldier to mow the yard, these sanctions included loss of Soldier's quarters and other actions permitted under the Uniform Code of Military Justice, 10 U.S.C.A. § 801 et seq.
 
 
 10
 In analogous soldier cases against Government under the Tort Claims Act, this Court has considered the question of whether a soldier was acting in the line of duty. One such instance where a soldier's actions were determined to be within the line of his duties arose in Hinson v. United States, 5 Cir., 1958, 257 F.2d 178. In Hinson, an officer was ordered to active duty on September 28, 1956 with pay and allowances to begin on that date. He was instructed to proceed from his home to Fort Sam Houston for arrival by October 8, 1956. While traveling to his assigned post, this soldier was involved in a collision with Hinson.
 
 
 11
 The manner in which this Court overruled the District Court's finding that the soldier was not within the scope of his employment has cogent and immediate application to Child's suit. As a preliminary matter, we remarked that
 
 
 12
 ". . . While 'acting in the line of duty,' 28 U.S.C.A. § 2671, is generally equated with traditional notions of scope of employment . . . the phrase reflects that Congress had in mind, and so must we, the special factors characteristic of military activity and discipline." Hinson, supra at 181. See also, Feres v. United States, 1950, 340 U.S. 135, 143-44, 71 S.Ct. 153, 95 L.Ed. 152.
 
 
 13
 The identical consideration arises in this controversy. Our opinion continued its analysis in Hinson in a form which has equally forceful bearing to Soldier.
 
 
 14
 Thus it is controlling that at the time of this collision, Capt. Westcott was performing a specific duty which had been assigned him to travel to Fort Sam Houston. In executing this order to proceed, he made use of his private automobile with the express authority of the Army. For this the Army bore the expenses which were "necessary in the military service." In so doing he was not going to work, he was then engaged in the performance of one of the very duties specifically assigned to him, receiving Army pay, subject to military discipline and not on leave. His only choice was the immaterial 6 one of route and means of travel. Id., at 182.
 
 
 15
 So too for Soldier. At the time of Child's injury, Soldier was performing a specific duty which had been assigned to him to cut his portion of the lawn, was receiving a Governmental subsidy through his living quarters, was subject to military discipline, and was not on leave. Soldier's only choice was the immaterial one of which type of Government permitted mowing device he would use. Under Alabama law, once it is recognized that Soldier was performing a duty specifically assigned to him, the necessary conclusion is, and we hold as a matter of law, that Soldier was acting within the scope of his employment.[14] Avco, supra; Perfection Mattress, supra.
 
 
 16
 In its simplest sense, "in line of duty" is a matter of definition in § 2671 governed by federal law and, as shown by Rayonier and Indian Towing, local law as the basis of liability does not undertake or require that we find that a situation the same or identical to the Soldier-Child one exists.
 
 
 17
 Before concluding this opinion, we need to dispense with two further reasons given by the District Court for holding that Soldier was not acting within the scope of his employment. In its opinion, the District Court described Soldier's duties in a very narrow fashion by homing in on his duty as a repair parts specialist who stocked, requisitioned, and reordered items for the motor pool to which he had been assigned. The conclusion was that Soldier could only be acting within the scope of his employment when he was performing his "primary duty" as a repair parts specialist. The Court, as does Government, undertook to support this result on Alabama law.[15] We reject this because our construction of the regulations and orders as applied to Soldier and his obedience to his orders is that Soldier was performing a task assigned to him one he was hired to do. We reemphasize that Soldier was both a parts man and a "lawn mower".[16]
 
 
 18
 Lastly, the District Court determined that a landlord-tenant relationship existed between Soldier and Government which by Alabama jurisprudence precludes recovery from the landlord for a tenant's torts. Because we have already held as a matter of law that Soldier was acting within the scope of his employment when Child was injured, no landlord-tenant relation exists, certainly not for FTCA purposes. That principle is simply inapplicable in this instance and we reject as a matter of law the application of any of the landlord-tenant cases cited by the District Court.[17]
 
 
 19
 For the foregoing reasons, the decision of the District Court is reversed and this case is remanded for further proceedings on negligence, cause and damages.
 
 
 20
 REVERSED and REMANDED.
 
 
 
 *
 Judge Thornberry, was a member of the panel that heard oral arguments but due to illness did not participate in this decision. This case is being decided by a quorum. 28 U.S.C. § 46
 
 
 **
 Of the U.S. Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Child is also known by the name Rhonda Kay Pace. Pace is the surname of her stepfather and Craft is her natural father's surname
 
 
 [2]
 Other parties to the original cause of action are Otasco Economy Auto Sales, Inc. and Modern Tool & Die Products, Inc. Summary judgment was not granted for or against these parties. This appeal comes before this Court upon the express determination that there is no just reason for delay in the entry of final judgment as to Government and the direction of entry of judgment pursuant to the requirements of F.R.Civ.P. 54(b)
 
 
 [3]
 For simplicity, Army Regulations (AR), Fort McClellan Regulations (FR), and Department of Army Pamphlet (PAM) will be cited by the foregoing initials. The recitation of applicable regulations is only a sampling and is not an exhaustive presentation. Some of those discussing maximum occupancy and economical utilization of resources and facilities are AR 210-50, para. 2-2; AR 210-10, paras. 1-5, 1-8; AR 210-50, paras. 10-16, 10-34; FR 210-19 (21 Sept. 1970), para. 3
 
 
 [4]
 AR 210-50, paras. 10-16(f); FR 210-19 (21 Sept. 1970), para. 5, f
 
 
 [5]
 Soldier had made arrangements for off-base housing and paid a one month deposit when he was "offered" the on-base housing. "Offered" is rather inapt because refusal of on-base housing is accompanied by forfeiture of the Basic Allowance for Quarters (BAQ). For Soldier the amount of BAQ he would have had to forego was $138.00. Thus, Soldier would have no on-base housing and no BAQ for an off-base residence. As counsel for Child asserted during oral argument, this is truly a Hobson's choice
 
 
 [6]
 Any contention that Government did not specify in detail procedures for grass cutting and other grounds maintenance is dispelled by PAM 210-2
 CHAPTER 6
 MAINTENANCE OF GROUNDS
 6-1. General Requirements. Quarters occupants are responsible for taking proper care of trees, shrubs (except as stated for trees and shrubs), flower beds, lawns, parking areas, walks, areas around garbage containers, and adjacent streets. Policing of appropriate portions of parkways in front of or behind houses is also your responsibility. Occupants of duplexes are responsible for policing around the entire building during any period in which one-half is vacant. The area of responsibility is generally defined as extending to the edge of adjacent streets, parking lots, or halfway between buildings or adjacent quarters. For those units which border common grounds, the area extends 75 feet from the quarters or as directed. Any questions regarding boundaries shall be referred to the Family Housing Office. Vehicles will not be driven on lawns at any time. Tent caterpillars, bagworms, lawn moths, loose dead turf, fairy rings (toadstools), premature leaf fall, red mites or other conspicuous evidence of disease and/or insect infestation will be reported.
 6-2. Maintenance of Lawns. a. Watering of Lawns. Lawns will be watered sufficiently to prevent the grass from drying out, but water should not be wasted. Thorough watering (approximately 1 inch) each seven to ten days is more effective than frequent shallow watering. Information on time and rate of irrigation for the specific equipment and conditions will be available from the Family Housing Manager or Facilities Engineering Office. Sprinklers will not be left in one place long enough to cause water runoff from the lawns. During hot dry periods, watering may be restricted or scheduled. A method of notifying occupants is optional, but it may appear in the daily bulletin. Certain types of lawns in various areas require winter irrigation.
 b. Mowing, Edging and Equipment.
 (1) Mowing of lawn areas is accomplished as often as necessary to keep lawns and other grassed areas in a neat appearing condition. Grass should be cut to a minimum height of one and one half inches. Certain turf grasses, such as St. Augustine and Kentucky blue grass form a better turf, use less water, resist invasion of weeds, and retain a darker green color if mowed at 2 inches to 3 inches height.
 (2) Lawns require edging along walks, driveways, roadside curbs, shrub beds, and other places where necessary to present a neat appearance. Grass should be edged along paved surfaces (fig. 6-1).
 (3) Lawnmower adjustable to recommended heights, edger, hand fertilizer spreader, and miscellaneous garden tools may be issued to each occupant to the extent that funds are available.
 c. Renovating, Seeding, Sodding and Fertilizing.
 (1) Minor lawn repair includes the filling of holes and reseeding of small bare areas or sodding as applicable depending on the type of turf grass.
 (2) Renovation includes raking and removal of thatch (old clippings and dead matted material) from the turf. Aerification requirements for compacted soils in play areas and the like will be referred to the proper authority.
 (3) Removal of grass clippings at the time of mowing is usually not required except for certain local conditions.
 Coupled with the dictates of PAM 210-2 is FR 210-2 (9 November 1966) which, among other things, specifies in greater detail by type of location, e. g., shoulders, airfields, parade areas, the minimum height below which grass may not be cut.
 
 
 [7]
 AR 420-24, para. 5. c. (1)
 
 
 [8]
 AR 210-50, para. 2-7 c. (7); FR 210-19, (21 September 1970) para. 5. h. (7). The senior ranking resident or occupant is the person in each apartment complex to whom complaints and queries are addressed
 
 
 [9]
 During oral argument, this Court asked counsel whether ride-type motorized lawn mowers were permitted under Government's regulations. No prohibition was pointed out to this Court. The record contains FR 420-2 (18 June 1973) which superseded FR 420-2 (9 November 1966) and specifies that hand or motorized lawn mowing equipment may be used. Also, AR 420-74, para. 57, states that ". . . occupants will mow lawns with power or hand pushed mowers . . . ."
 
 
 [10]
 28 U.S.C.A. § 1346(b) allows the United States to be a defendant in civil actions on claims ". . . against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
 
 
 [11]
 Section 2671 defines employee of the government and acting within the scope of his employment
 "Employee of the government" includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.
 "Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States, means acting in line of duty. (Emphasis added).
 
 
 [12]
 See note 11, supra
 
 
 [13]
 28 U.S.C.A. § 1346(b); see Logue v. United States, 1973, 412 U.S. 521, 526-30, 93 S.Ct. 2215, 37 L.Ed.2d 121
 At this juncture, we also consider the District Court's discussion about the manner and means of control over Soldier by Government essential for a master-servant or employer-employee status to exist. Based on the record and briefs before this Court that status is uncontradicted.
 If control should be relevant, the amount retained by Government is overwhelming. AR 420-24, para. 3 states:
 The Self Help Program is a management tool whereby the manpower resources of the military personnel and occupants of housing are employed for the accomplishment or limited . . . maintenance and repair work.
 AR 420-74, para. 57 specifies that ". . . occupants will mow lawns with power or hand pushed mowers . . . ." FR 420-12, para. 4.e (1 April 1970), states "occupants of family housing will insure: . . . (2) That grass is kept neatly trimmed . . . ." Included in FR 420-10 (28 September 1970), is the provision that "work accomplished by family housing occupants include: b. Policing their grounds, including lawn mowing . . . ." Clearly, part of Soldier's duties as one required to live in on-base quarters was to mow that portion of the lawn assigned to his care. As clearly demonstrated as the duty to mow is the degree of control retained over Soldier.
 The degree of control exercised by Government is indicated by Soldier's query to the Housing Office about his duty to mow the grass. The response restated such a duty. On moving into the on-base quarters, Soldier was given oral and written instructions which included directions to police and mow the yard. Finally, the inspections conducted and the possibility of sanctions being imposed for failure to properly maintain the yard convey unequivocally the control exercised by Government over Soldier. Such pervasive control is indicative of the master-servant or employer-employee relationship which results in application of respondeat superior.
 
 
 [14]
 This Court is aware of United States v. Campbell, 5 Cir., 1949, 172 F.2d 500, 503, which intimates that "acting within the scope of his office or employment" as used in 28 U.S.C.A. § 1346(b) is narrower than "in line of duty" and that inclusion of acts of military personnel done in the line of duty within the parameters of scope of employment would create two inconsistent meanings for scope of employment. One would be for the military only and a differing, more narrow one for other employees of Government
 In light of the definition of "in line of duty" given in 28 U.S.C.A. § 2671 as utilized in Hinson and subsequent decisions, such criticism is no longer viable. See Hallberg v. Hilburn, 5 Cir., 1970, 434 F.2d 90, 91; United States v. Farmer, 8 Cir., 1968, 400 F.2d 107, 109; United States v. Romitti, 9 Cir., 1966, 363 F.2d 662, 664-67; United States v. Culp, 5 Cir., 1965, 346 F.2d 35, 36. When this subsequent interpretation of "in line of duty" from Hinson and others is coupled with a disavowal of another supposition implicit in the Campbell analysis that the acts done "in line of duty" are singularly governmental not undertaken by private employers, Campbell's precedential value vanishes. The teaching of Indian Towing Co. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, and Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354, is that vicarious liability under the Tort Claims Act is not to be determined as that of a private person "under same circumstances". It is "under like circumstances". (Emphasis supplied). Indian Towing, supra at 64, 76 S.Ct. at 124, 100 L.Ed. at 53. In United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, 327, this Court, as the Supreme Court in Indian Towing and Rayonier, rejected the argument that the Tort Claims Act excludes Government from liability for activities which private persons do not perform that is, for uniquely governmental functions. Recognition that any act performed while one is in the military may be categorized as uniquely federal exemplifies the rejection of a "same or identical standard" under the Tort Claims Act. Private employers are not the military, nor vice versa.
 To maintain the Campbell dual standard for scope of employment would overlook the post-Campbell determinations of the Supreme Court and this Court by imposition of the already rejected "uniquely federal activities" argument those performed by the military through the device of "in line of duty". The demise of the Campbell distinction is highlighted when one considers that had Soldier under identical direction and control factors been assigned the duty of mowing the lawn by a private employer, Soldier would not have been acting outside the scope of his employment. From this perspective, the dictum in Campbell has little life.
 
 
 [15]
 Both the District Court in its ruling and Government in its brief utilize a quotation from Nelson v. Johnson, Ala., 1956, 264 Ala. 422, 88 So.2d 358, to limit the scope of employment concept to a single task. Under Johnson it is asserted that
 The test is the service in which the employee is engaged. . . . The rule which has been approved for determining whether certain conduct of an employee is within the line and scope of his employment is substantially that if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment. Id., at 427, 88 So.2d at 361.
 From this recitation, both the District Court and Government argue that Alabama law requires an employee to be performing the act for which an employee has been hired before an action will be deemed to occur within the scope of employment. Even if and the if is a very big if such a limited construction were proper, this Court's holding is that Soldier was engaged to perform tasks in the repair parts capacity and in the maintenance of the lawn bordering Soldier's quarters. As such, Soldier comes within even what we believe to be too limited an interpretation of Johnson.
 Johnson discusses whether the employee was performing an act for which he had been hired. Consequently, once the Alabama Court determined that sufficient evidence existed showing that the employee had been performing a service for which he had been employed to do, no consideration of other tasks for which the employee may have also been hired or told to perform was necessary. If one duty or task being performed at the time of an incident is demonstrated to be within the scope of employment, that a second or other one was also being performed need not be shown. It would be redundant. Reliance on any such limited usage of Johnson is misplaced.
 
 
 [16]
 An examination of both older and newer Alabama cases demonstrates that "scope of employment" is not necessarily limited to the primary duty. Palos Coal Co. v. Benson, Ala., 1905, 145 Ala. 664, 39 So. 727; Perfection Mattress, supra, 182 So. at 8; Solmica of the Gulf Coast, supra, 232 So.2d at 642; and Sibley v. Adams, Ala., 1975, 324 So.2d 287, 290, speak in terms of duties assigned not just the or a duty
 
 
 [17]
 Southern Apartments, Inc. v. Emmett, Ala., 1959, 269 Ala. 584, 114 So.2d 453, and Merritt v. United States, 1 Cir., 1964, 332 F.2d 397, were cited in the District Court's ruling